IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERTO C. GOMEZ                    §
                                    §
            Plaintiff,              §
                                    §
v.                                  §        CIVIL ACTION NO. 4:11-3302
                                    §
                                    §
URS CORPORATION,                    §
                                    §
            Defendant.              §

## ORDER

### I.

Pending before this Court is Defendant URS Corporation ("Defendant" or "URS")'s motion for summary judgment. **(Instrument No. 10)**.

### A.

On September 7, 2011, Plaintiff Roberto C. Gomez ("Plaintiff" or "Gomez") filed suit in this Court against URS, alleging violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Employment Retirement Income Security Act ("ERISA), 29 U.S.C. § 1140, *et seq.* (Instrument No. 1 at 1). URS has filed this motion for summary judgment. (Instrument No. 10). Plaintiff has filed a response in opposition. (Instrument No. 18). Defendant has filed a reply, as well as objections to Plaintiff's evidence attached to his response. (Instrument Nos. 24; 25).

### B.

Plaintiff was originally hired in 1994 by a company that was later acquired by URS. (Instrument No. 10-1 at 9-10). Plaintiff worked as a CAD operator until April 2000. (Instrument No. 10-1 at 9-10). In February 2006, Plaintiff returned to URS as an Engineer in Training.

(Instrument No. 10-1 at 12; 77). An Engineer in Training is a position for employees who have obtained a degree in engineering but have not yet obtained their professional engineering license. (Instrument No. 10-1 at 54). Upon his rehire, Plaintiff reported to John Kovski ("Kovski"), who also evaluated Plaintiff's performance. (Instrument No. 10-1 at 12). Plaintiff passed his Professional Engineer exam in December, 2006, and became a Professional Engineer ("PE"). (Instrument No. 18-2 at 2).

Kovski conducted annual evaluations of Plaintiff's performance. In October 2006, Kovski rated Plaintiff as "Needs Improvement" in technical competence, customer focus, and delivering on commitments. (Instrument No. 10-1 at 81-82). Plaintiff's overall performance rating for 2006 was "Meets Expectations." (Instrument No. 10-1 at 82). In November 2007, Kovski's annual evaluation of Plaintiff's performance does not appear to contain ratings from Kovski, only from Plaintiff, because the "manager rating" boxes are blank. (Instrument No. 10-1 at 86-87). However, under "demonstrates professional behavior," Plaintiff commented on his own evaluation that "[d]uring the last year I have not had ample opportunity to practice my professional behavior due to a light work load." (Instrument No. 10-1 at 86-87). Under "technical competence," Plaintiff wrote, "I think that my skills demonstrate breadth but not depth of skills and capabilities." (Instrument No. 10-1 at 86). Under "creating value," Plaintiff wrote, "[d]uring the past year I have not had ample opportunity to create value." (Instrument No. 10-1 at 87). In February 2009, Kovski conducted his annual evaluation of Plaintiff's performance for the year 2008. (Instrument No. 10-1 at 91-95). Plaintiff did not receive any "Needs Improvement" ratings for 2008. (Instrument No. 10-1 at 91-92).

URS department managers and group leaders regularly created "forced rankings," also called a Staff Analysis Matrix, of their subordinates. (Instrument No. 10-1 at 104). In these

forced rankings, employees were grouped by job category and level of responsibility and then evaluated in comparison to each other on technical competency, flexibility, work ethic, behavior, dependability, and "billability," which refers to the time the client is charged for work performed by an employee for work on a particular project. (Instrument No. 10-1 at 104; Instrument No. 10 at 11). One such forced ranking was completed in January 2009. (Instrument No. 10-1 at 105). This ranking shows Plaintiff as the second-to-lowest ranked employee out of ten in the Houston office in the job classification of PP-10 to PP-11. (Instrument No. 10-1 at 105, 107.) The PP-10 and PP-11 job responsibility levels were the appropriate levels for a professional engineer. (Instrument No. 10-1 at 78). The forced ranking includes a category for technical competency, which accounts for 40% of the overall ranking; flexibility, which accounts for 10% of the overall ranking; work ethic, which accounts for 10% of the overall ranking; "behavior and relate with others," which accounts for 15% of the overall ranking; dependability, which accounts for 5% of the overall ranking; and billability, which accounts for 20% of the overall ranking. (Instrument No. 10-2 at 107).

Plaintiff was first diagnosed with Hepatitis C in 1993. (Instrument No. 10-1 at 14). Plaintiff claims that he first informed Kovski of his diagnosis in early 2007, when he started a treatment for Hepatitis C that could have side effects. (Instrument No. 10-1 at 14-15). Kovski, however, claims that he learned of Plaintiff's Hepatitis C for the first time in May 2009. (Instrument No. 18-4 at 91-92). On May 6, 2009, Plaintiff completed and gave to Kovski an FMLA request form. (Instrument No. 10-1 at 16). The form requests medical leave beginning on May 11, 2009 and ending on April 5, 2010, and Plaintiff has handwritten "intermittent" in between the dates on the form. (Instrument No. 10-1 at 35). Plaintiff testified at his deposition that "intermittent" meant "that the duration of the leave that I requested was for a year

approximately on an intermittent basis, not a continuous year. . . . [I]t would give me the opportunity that if I felt lousy, you know, then I would take FMLA leave." (Instrument No. 10-1 at 16).

He requested the FMLA leave at that time because his liver specialist recommended that he begin a new treatment and he wanted to "protect my position if . . . I did not feel healthy enough or energetic enough to go to work and also for when I had to take time off for endoscopies, MRIs, that sort of thing." (Instrument No. 10-1 at 16-17). When he submitted the request, he did not have a specific day or time that he was planning to take off. (Instrument No. 10-1 at 17). Instead, he requested the leave as a "safety net." (Instrument No. 10-1 at 17). Attached to the form was Plaintiff's health care provider's certification, signed on April 30, 2009 by Clive K. Fields, M.D, Plaintiff's primary care physician. (Instrument No. 10-1 at 37-40). The certification states that Plaintiff is diagnosed with Hepatitis C and is undergoing anti-viral injections, the duration of which are dependent on the outcome of treatment. (Instrument No. 10-1 at 37). The form also states that Plaintiff "may experience brief episodes of incapacity following treatment. Patient is not now incapacitated." (Instrument No. 10-1 at 37). Furthermore, although Plaintiff "is able to perform his regular duties[,] if employee is unable to perform his regular duties, it will be necessary for him to be absent from work in order to recover from the effects of his treatment." (Instrument No. 10-1 at 38).

Kovski signed the form on May 6, 2009, giving "supervisor approval" as required by the form. (Instrument No. 10-1 at 35). Bruce Broberg signed the form on May 8, 2009, in the "office manager approval" space on the form. (Instrument No. 10-1 at 35). Plaintiff testified that every time he needed to leave work to go to a medical procedure, Kovski allowed him to do so, and Plaintiff was never disciplined for seeking treatment. (Instrument No. 10-1 at 18).

Both Plaintiff and Defendant agree that Plaintiff's billable hours began to decrease sometime in early to mid 2009 because of the economic downturn. (Instrument No. 10-1 at 20, 58). Plaintiff started to become concerned "in the late spring" that he was not getting sufficient work because "the economic downturn was hitting us." (Instrument No. 10-1 at 20, 25). There is no clear indication if this concern began before, after, or simultaneous with the approval of his FMLA leave. When Plaintiff asked Kovski about finding more work, Kovski's response was usually to advise him to ask if other managers had work for him to do. (Instrument No. 10-1 at 20). Kovski testified that asking other managers for work was standard practice at URS when an employee was facing a work shortage. (Instrument No. 18-4 at 98). Plaintiff believes he was capable of working on projects that other employees were assigned to, but he is not able to point to specific projects that Kovski assigned to another employee instead of to Plaintiff. (Instrument No. 10-1 at 24). Plaintiff testified that when he asked Kovski for more new assignments, "on one occasion his response was that he had work but he had to give it to somebody that could get it done, which I interpreted to mean that he was seeing me as unreliable." (Instrument No. 10-1 at 18).

Plaintiff claims that while he was not able to find sufficient billable work, a younger engineer named Dacia Lawellin ("Lawellin") "was being kept busy by" Kovski. (Instrument No. 10-1 at 23). Lawellin was an entry-level worker who had just graduated from college and provided a supporting role on projects. (Instrument No. 18-4 at 75). Kovski testified that Lawellin would not be able to become a professional engineer for four years, and Kovski describes the difference between the work Plaintiff and Lawellin were able to do as "night and day." (Instrument No. 18-4 at 78-79). Plaintiff could have done the work Lawellin was doing,

but "[i]t would have been a misuse of his skills . . . [b]ecause he could do design work, seal drawings, develop plans, and, I mean, he had a different skill set." (Instrument No. 18-4 at 79).

After Plaintiff spent a weekend moving residences, he requested and was granted a week of FMLA leave on July 27, 2009. (Instrument No. 10-1 at 19). When he returned from leave, he returned to the same job and position as he had held before he took leave. (Instrument No. 10-1 at 20). He admits that there was never a time when he wanted or requested FMLA leave and was prevented from taking it. (Instrument No. 10-1 at 20). He also testified that he did not notify URS that he wanted to take another period of FMLA leave. (Instrument No. 10-1 at 20).

During the summer of 2009, Bruce Broberg ("Broberg"), at that time Officer Manager of URS, was informed by the regional manager to take the steps necessary to achieve the "sold time" objectives of the Houston office. (Instrument No. 10-1 at 105). URS defines sold time as the percentage of their employees' time spent on matters that can be billed to clients. (Instrument No. 10-1 at 105). Sold time had been decreasing in the Engineering and Construction department, of which Plaintiff was a member, throughout 2009 because of the economic downturn. (Instrument No. 10-1 at 104-05). In order to meet the Houston office's sold time objectives, Broberg met with Rich Squire ("Squire"), the Engineering and Construction Department Manager, and instructed him to formulate recommendations for selectively eliminating employees from the department. (Instrument No. 10-1 at 105). Squire in turn met with his subordinate managers to discuss which employees to include in a reduction in force ("RIF").

Squire presented Broberg with recommendations regarding who from his department should be included in the RIF. (Instrument No. 10-1 at 105). Squire's affidavit states that Kovski's entire group was not busy in 2009 and therefore his "group members [were] prime

targets for a reduction in force." (Instrument No. 10-1 at 99-100). Squire and his subordinates used the 2009 forced rankings as a "starting point for discussions of who should be let go." (Instrument No. 10-1 at 100). Kovski also stated that they "reviewed the most recent [January 2009] matrix of forced rankings to determine whether any circumstances had changed in the interim period that would affect the prior rankings." (Instrument No. 10-1 at 78). In fact, according to Kovski's deposition testimony, "the forced rankings were the systematic process by which we identified the people that we thought we could best do without in a turndown." (Instrument No. 18-4 at 142). They also considered projects underway at that time, projects "in the pipeline," and projects they hoped to obtain. (Instrument No. 10-1 at 100). They discussed which employees were the most flexible and had the broadest skill sets. (Instrument No. 10-1 at 100). According to Kovski, "[a]t the conclusion of our discussions, I informed Mr. Squire that there were two individuals on the list of civil engineers under my supervision that I could most easily do without. One of those was Roberto Gomez." (Instrument No. 10-1 at 78).

Ultimately, Squire recommended the termination of several employees, including Plaintiff, and Broberg approved the termination of five employees from Squire's department. (Instrument No. 10-1 at 105). All three of the lowest-ranked employees in the January 2009 forced ranking were included in the RIF, including Plaintiff. (Instrument No. 10-1 at 100). Three employees from the Environmental Department were also terminated in the same RIF. (Instrument No. 10-1 at 105).

When Plaintiff was laid off by Kovski and Squire, Plaintiff testified that they told him, "due to the work that was in-house already and the work that would be coming in in the foreseeable future, that it did not fit my skill set." (Instrument No. 10-1 at 21). Plaintiff was surprised because his "skill set is broadly diversified" and he has "done a lot in civil and

environmental engineering." (Instrument No. 10-1 at 21). There was no mention during the meeting about Plaintiff's FMLA leave. (Instrument No. 10-1 at 21-22).

Under the URS Retiree Health Plan, an employee retiring at the age of 55 years or older with at least ten years of service with the company or its successors may be eligible for continued health care coverage. (Instrument No. 10-1 at 109). Individuals enrolled in the retiree health plan are charged the total premium for the coverage elected. (Instrument No. 10-1 at 109). URS does not pay any portion of the premium, and participation in the plan is more expensive than continuation of coverage under COBRA. (Instrument No. 10-1 at 109).

## II.

Defendant has filed objections (Instrument No. 25) to Plaintiff's declaration, which he attaches to his response in opposition to summary judgment (Instrument No. 18-2). Plaintiff has not filed a response to Defendant's objections.

Defendant argues that several of the statements contained in the declaration are legal conclusions without factual basis. (Instrument No. 25 at 2-3, 4). Specifically, Defendant complains that Plaintiff states that: he was qualified for FMLA leave because he fit the legal qualifications; he was better qualified than a co-worker and should have been assigned work instead of her; he was terminated because he requested FMLA leave and took FLMA leave; he should not have been selected for the reduction in force; Kovski did not think Plaintiff was reliable because he was eligible for FMLA leave; and Plaintiff was terminated because Kovski thought Plaintiff was unreliable because of his medical condition. (Instrument No. 18-2 at 3-4, 7). Additionally, Defendant objects to Plaintiff's claim that one of Defendant's arguments is senseless. (Instrument No. 18-2 at 4). The Court need not consider each of the statements Defendant has identified in turn. Defendant is objecting to Plaintiff's inclusion of legal

arguments and conclusions in his declaration. These arguments are all included in Plaintiff's response in opposition to summary judgment itself, and the Court does not give these arguments more weight simply because they are included in Plaintiff's declaration. Instead, the Court will properly consider the statements as legal arguments and address them below, when it conducts its legal analysis. On that ground, Defendant's objections are **OVERRULED**.

Next, Defendant argues that parts of the declaration are not based on Plaintiff's personal knowledge. (Instrument No. 25 at 3-4). Specifically, Defendant points to Plaintiff's claims that Defendant rehired Plaintiff "because of the breadth of [his] skills" and "because I did have CAD and support experience in addition to becoming a Professional Engineer in 2006." (Instrument No. 18-2 at 4). Defendant relies on Federal Rule of Evidence 602, which states that a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Plaintiff cannot testify to what motivated Defendant to hire him because he lacks personal knowledge of the issue. If Plaintiff wanted to establish that Kovski or URS hired him for certain reasons, he must cite to Kovski's testimony at his September 18, 2012 deposition, or other evidence that would adequately establish Kovski or URS's motivations. *See* (Instrument No. 18-4). Defendant's objections to this evidence are **SUSTAINED**.

Defendant also objects to Plaintiff's claim that Kovski knew that Plaintiff "had Hepatitis C and cirrhosis. He also knew that in 2007 I had taken part in a drug study to attempt to eradicate my Hepatitis and that I had become very ill during that study." (Instrument No. 18-2 at 4). Although Kovski does deny knowing about Plaintiff's medical condition before 2009 (Instrument No. 18-4 at 91-92), Plaintiff testifies in his deposition that he informed Kovski of his medical condition in 2007 because of the drug study and the potential for side effects.

(Instrument No. 10-1 at 14-15). Defendant does not object to Plaintiff's deposition testimony. Because the Court will not rely upon this part of the declaration in its determination of the motion for summary judgment, and will instead look to Plaintiff's deposition testimony, these objections to the declaration are **OVERRULED as moot**. *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 886 (S.D. Tex. 2011) (Gilmore, J.).

Defendant also points to Plaintiff's allegations that Defendant, and Kovski in particular, knew specifics about Plaintiff's qualifications relating to environmental engineering because Plaintiff had provided this information on his resume during his 2006 interview. (Instrument No. 18-2 at 5-6). Defendant argues that the resume itself is not in the record, there is no evidence that he provided this resume to Defendant, and there is no evidence that Kovski read its contents. However, these comments appear to be supported, at least in part, by Kovski's own deposition testimony. Kovski testified that Plaintiff had a unique skill set, including his CAD background, and had experience in environmental civil engineering. (Instrument No. 18-4 at 25, 31). Although the Court will not rely on Plaintiff's declaration for support for his assertions, there is still independent foundation in the record for his claims. Because the Court will not consider or rely upon these parts of the declaration in its determination of the motion for summary judgment, these objections are **OVERRULED as moot**. *Brantley*, 821 F. Supp. 2d at 886.

Finally, Defendant objects to Plaintiff's statements regarding how he believes Defendant should have evaluated him and conducted the RIF. (Instrument No. 25 at 5). Specifically, Defendant objects to Plaintiff's assertions that: Defendant did not include certain hours in Plaintiff's billable hours; Kovski was aware those hours could have been included in his billable hours; the hours should have been billed to a suspense account and therefore would have counted as billable hours; and his total billable hours suffered as a result. (Instrument No. 18-2 at 4-5).

Once again, however, Defendant is objecting to Plaintiff's legal arguments and conclusions, which the Court will address in its analysis. Defendant has not given any basis for striking the statements from the record, only for refusing to deny summary judgment on the basis of the statements. On that ground, Defendant's objections are **OVERRULED**.

Accordingly, as described above, Defendant's objections to Plaintiff's declaration are **SUSTAINED in part and OVERRULED in part**. (Instrument No. 25).

### III.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact,

it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (*quoting Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor

does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas,* 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## IV.

Plaintiff has alleged claims against Defendant based on the termination of his employment, claiming that: (1) Defendant violated the FMLA by denying him leave and interfering with his ability to take leave protected by the FMLA; (2) Defendant violated the FMLA by terminating his employment in retaliation for seeking FMLA leave; and (3) Defendant interfered with his employment benefit plan participation in violation of ERISA when it terminated his employment before he had attained ten years of service with Defendant. (Instrument No. 1 at 1; Instrument No. 18).

### A.

Under 29 U.S.C. § 2615(a)(1), an employer is prohibited from interfering with or restraining an employee from exercising, or attempting to exercise, his or her FMLA rights. *Bell v. Dallas Cnty.*, 432 F. App'x 330, 334 (5th Cir. 2011). "With an interference claim, an employee must show that he was denied his entitlements under the FMLA, or, that an employer did not respect the employee's FMLA entitlements." *Id.* "Generally, proof of injury under the

FMLA requires evidence that the plaintiff was denied FMLA leave improperly." *Arismendiz v. Univ. of Texas at El Paso*, 536 F. Supp. 2d 710, 716 (W. D. Tex. 2008) (citing *De La Garza-Crooks v. AT&T*, 252 F.3d 436, 2001 WL 361099, *1 (5th Cir. 2001)); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1274 (11th Cir. 1999) ("[A] plaintiff suffers no FMLA injury when she receives all the leave she requests.").

Here, the undisputed summary judgment evidence establishes that Defendant promptly granted Plaintiff's request for intermittent FMLA leave. (Instrument No. 10-1 at 35). Plaintiff admits that every time he needed to leave work for medical treatment he was permitted to do so and that he was never disciplined for seeking treatment. (Instrument No. 10-1 at 18). Furthermore, the sole time that Plaintiff requested FMLA leave, the week of July 27, 2009, he was granted the leave. (Instrument No. 10-1 at 19). When he returned from leave, he returned to the same job and position as he held before the leave. (Instrument No. 10-1 at 20). There was never a time when he wanted or requested FMLA leave and was prevented from taking it. (Instrument No. 10-1 at 20). Finally, following the July 2009 leave, he did not again notify Defendant that he wanted to take another period of FMLA leave. (Instrument No. 10-1 at 20).

Plaintiff's claim for interference with his FMLA rights therefore must fail as a matter of law. Plaintiff received all the leave he requested, and he admits that he was never denied leave or even discouraged from taking leave. Plaintiff's only two arguments for why his interference claim should survive summary judgment address Defendant's alternative arguments in favor of summary judgment: first, that Plaintiff had stopped taking his Hepatitis C medication before his termination; and second, that Plaintiff did not provide sufficient notice of his intent to take FMLA leave. (Instrument No. 18 at 13-14). The Court need not reach Defendant's alternate arguments because it grants summary judgment on other grounds. Plaintiff does not address

Defendant's primary argument, and this Court's basic holding: that Plaintiff cannot maintain an FMLA interference claim where he concedes that he was granted all the leave he sought.

Accordingly, Defendant's motion for summary judgment on the issue of FMLA interference is **GRANTED**.

## B.

"To make a *prima facie* case of retaliatory discharge [under the FMLA], the employee must show that (1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge." *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005). Once Plaintiff establishes his prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If Defendant succeeds, the burden shifts back to Plaintiff to show by a preponderance of the evidence that Defendant's articulated reason is pretext for discrimination. *Id.*

The Court finds that Plaintiff has established a prima facie case of retaliatory discharge. Defendant first disputes that Plaintiff engaged in a protected activity because he had discontinued anti-viral treatments in August 2009, one month before he was terminated. (Instrument No. 10 at 17). Plaintiff argues that he never informed Defendant that he had changed medications and that he was still eligible for intermittent FMLA leave after August 2009 because the new medication also caused side effects. (Instrument No. 18 at 13-14). The Court agrees with Plaintiff that he was continuing to engage in a protected activity. Even if he were not, "[t]he FMLA's proscriptive protections, however, encompass the employer's conduct both during and after the employee's FMLA leave," so Defendant's argument is unavailing. *See Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 401 (5th Cir. 2012). Because Plaintiff applied for and took

FMLA leave in the past, he can meet the first prong of the prima facie case. The parties do not dispute that Defendant discharged Plaintiff, so Plaintiff can meet the second prong of the prima facie case.

"When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the termination." *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (citations omitted). "The plaintiff is . . . required to show that the protected activity and the adverse employment action are not completely unrelated." *Id.* (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). Here, Plaintiff was terminated as part of the RIF while he was eligible for FMLA leave. The Court finds that this is sufficient for Plaintiff to make out his prima facie case.

The burden then shifts to Defendant to set forth a legitimate, non-discriminatory reason for terminating Plaintiff's employment. *Richardson*, 434 F.3d at 332. Defendant argues that Plaintiff was among the three lowest-ranked employees when Defendant was forced to conduct a RIF in September 2009, and that he was properly included in the RIF. (Instrument No. 10 at 20). An RIF is a legitimate, non-discriminatory reason for termination, *Baumeister v. AIG Global Inv. Corp.*, 420 F. App'x 351, 354 (5th Cir. 2011), so the burden shifts back to Plaintiff to establish pretext.

A plaintiff can rebut the presumption of legitimacy by showing either: (1) the RIF is merely a sham or a pretext for discrimination, or (2) although the RIF is legitimate on its face, the employer implemented it in such a way that a protected characteristic or activity was impermissibly used as a factor to determine which employees were terminated. *See Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 268-69 (N.D. Tex. 2011) *aff'd sub nom. Powell*

*v. Dallas Morning News, LP*, 486 F. App'x 469 (5th Cir. 2012) (citing *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004)). Plaintiff has not argued that the RIF was merely a sham, and instead attempts to establish pretext by arguing that Defendant's reasons for including Plaintiff in the RIF were not the real reasons for his termination. Plaintiff has set forth four reasons why Defendant's proffered legitimate reason is pretext. First, Plaintiff claims that Kovski did not use objective criteria when creating the January 2009 forced rankings. (Instrument No. 18 at 16). Second, Plaintiff claims that Kovski could have given Plaintiff work he instead assigned to other engineers, such as Lawellin, and that if Kovski had assigned Plaintiff that work, his forced ranking would have been different. (Instrument No. 18 at 16-17). Third, Plaintiff argues that Lawellin should have been terminated in connection with the RIF instead of Plaintiff. (Instrument No. 18 at 17). Fourth, Plaintiff argues that because he was qualified to work at URS, he should not have been selected for the RIF. (Instrument No. 18 at 9). The Court will address each argument in turn.

Plaintiff first argues that Kovski created the forced ranking system and did not use objective criteria when evaluating Gomez. (Instrument No. 18 at 16). The law is clear that the "mere fact that an employer uses subjective criteria is not, however, sufficient evidence of pretext." *See Manning v. Chevron Chem. Co.*, LLC, 332 F.3d 874, 882 (5th Cir. 2003) (requiring more evidence of pretext in a Title VII case). Plaintiff's conclusory assertion cannot establish that Defendant's reasons for including him in the RIF were pretextual.

Plaintiff's second argument is that Kovski could have given work to Plaintiff but instead assigned it to other engineers, Lawellin in particular, and that the failure to do so demonstrates Defendant's intention to decrease Plaintiff's billable hours so he could be included in the RIF.[1]

---

[1] Plaintiff also complains that Kovski would not let him bill certain hours to a "suspense account," which is an account URS uses for protects in which the billable hours were not yet approved. (Instrument No. 18 at 11).

Defendant responds that Kovski assigned Lawellin support-level work that was far below Plaintiff's skill and experience levels. (Instrument No. 18-4 at 79). Defendant's decision that it was a more efficient use of resources to assign support-level work to Lawellin instead of to Plaintiff, who was a more experienced engineer, is a business decision that this Court will not second-guess. *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (a court "conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions").

Plaintiff argues that Kovski's failure to assign Plaintiff the support-level work instead assigned to Lawellin was in retaliation for Plaintiff's decision to apply for FMLA leave. (Instrument No. 18 at 6-7, 16-17). If Plaintiff were correct, the business decision exception would not apply. *See Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.") Plaintiff claims that two pieces of evidence, Kovski's comment that he needed to give the assignment to someone who could "get it done" and Kovski's admission that he sometimes assigned work beneath an employee's level to keep the employee busy, support his position. (Instrument No. 18 at 17).

When Plaintiff asked Kovski why he was not assigned the work that was given to Lawellin, Kovski told him he needed to give it to someone who could "get it done." (Instrument No. 10-1 at 18; Instrument No. 18 at 7-8). Plaintiff argues that he realized that Kovski was referring to Plaintiff's medical leave and that this demonstrates pretext because the comment occurred immediately after Plaintiff first requested intermittent FMLA leave. (Instrument No. 18 at 7-8, 17). However, the law is clear that unless the assignments themselves rise to the level of

---

However, Plaintiff has offered no evidence that the work was ultimately approved, so that it could be counted toward his billable hours. *See* (Instrument No. 18 at 11-12; Instrument No. 24 at 9). Therefore, this cannot establish evidence of pretext.

adverse employment decisions, which Plaintiff does not allege, Plaintiff must be able to connect Kovski's assignment of work to the RIF. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004) ("[S]ince the training and assignment decisions themselves were not adverse employment actions, they must be connected to the reduction-in-force. However, nothing in the record suggests that the training and assignment decisions were made with prescient knowledge of the yet-to-be ordered reduction-in-force.") As in *Roberson*, Plaintiff has not pointed to evidence that Kovski made his assignment decisions with knowledge that a RIF could occur in the future. Plaintiff alleges that his reduction in assignments began sometime in the spring of 2009, and the undisputed evidence shows that discussions about the RIF between Kovski and other managers did not begin until August 2009. (Instrument No. 10-1 at 20, 78). Therefore, Kovski's comment and his assignment of work to Lawellin instead of Plaintiff cannot be evidence of pretext.

Furthermore, Plaintiff never heard Kovski mention Plaintiff's medical condition or his FMLA leave. Plaintiff had not taken or requested to take any time off when Kovski made this comment, so Plaintiff's unsupported allegation that Kovski was referencing Plaintiff's medical treatments is not only speculative but also inaccurate. *See* (Instrument No. 18-4 at 137) (establishing timeline for Kovski's comment). Both Kovski and Plaintiff agree that Plaintiff never allowed his medical condition to impact his attendance or work performance. (Instrument Nos. 10-1 at 16; 18-4 at 118-119). There is no indication that Kovski gave Lawellin instead of Plaintiff assignments in retaliation for Plaintiff requesting or taking FMLA leave. (Instrument No. 18 at 17). The Court finds that Kovski's comment does not demonstrate pretext.

Plaintiff also argues that Kovski sometimes assigned projects below other employees' skill levels to keep employees busy. (Instrument No. 18 at 17). The apparent implication of this

argument is that Kovski's failure to assign Plaintiff similar low-level work demonstrates Kovski's discriminatory intent toward Plaintiff. However, Plaintiff misstates Kovski's testimony, as well as Plaintiff's own argument. Kovski was informed by Plaintiff's counsel during Kovski's deposition that Plaintiff "claims that some of the work that he was given in the 2009 time frame was not as challenging as would be expected to be assigned of an engineer of his experience and background," and Kovski was asked to explain why Plaintiff might make that complaint. (Instrument No. 18-4 at 130). Kovski responded that Plaintiff "was probably given projects and opportunities that weren't up to the skill level that he had for the simple reason that we were running out of work and we were just trying to keep him busy on what was available." (Instrument No. 18-4 at 130). Therefore, Plaintiff is both claiming that Kovski should have assigned him support-level work below his skill level and complaining about the times that Kovski did assign him work below his skill level. The fact that Kovski occasionally assigned Plaintiff lower-level work does not demonstrate pretext. Accordingly, this Court will not second-guess Defendant's decisions in handing out assignments to its employees. *See LeMaire*, 480 F.3d at 391.

Additionally, the Court notes that Plaintiff's second pretext argument must fail because Plaintiff has introduced no evidence indicating that, even if Defendant had handed out its assignments differently, the outcome of the RIF would have been different. Plaintiff has essentially "cherry-picked" one factor, his billability rating, to argue that he was selected for the RIF for discriminatory reasons. Courts do not allow this. *See Smith v. Hewlett-Packard Co.*, 512 F. Supp. 2d 587, 594 (N.D. Tex. 2007) ("But even if a reasonable jury could doubt [Defendant's] rating of "2" in this one area, [Defendant] evaluated [Plaintiff] poorly based on a total of eleven different categories. [Plaintiff] is attempting to avoid summary judgment by cherry picking one

example that [Defendant] gave in support of one category of a multi-component metric."); *see also Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) (a plaintiff "cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination"). The billability ranking was one category out of five in the forced ranking, and it accounted for 20% of each employee's overall score. (Instrument No. 10-1 at 107). Plaintiff has pointed to no evidence that his billability would have increased such that he would not have been among the lowest ranked employees who were included in the RIF if he had been given the support-level work assigned to Lawellin. Therefore, he cannot show that Defendant did not subjectively believe in the accuracy of the rankings, which is necessary for a factfinder to find that the ranking or Plaintiff's inclusion in the RIF was pretextual. *See Smith*, 512 F. Supp. 2d at 594.

Plaintiff's second pretext argument also depends on the timing of the reduction in his billable hours. Plaintiff claims that he never had problems with finding enough work before the spring of 2009, but the record does not support this claim. (Instrument No. 18 at 7). Specifically, on his past performance reviews, Plaintiff himself complained of his light work load, noting that "[d]uring the last year I have not had ample opportunity to practice my professional behavior due to a light work load" and "[d]uring the past year I have not had ample opportunity to create value." (Instrument No. 10-1 at 86-87). Therefore, Plaintiff had difficultly finding sufficient work at times several years before he requested FMLA leave. Second, the January 2009 forced rankings, which placed Plaintiff second-to-last out of ten engineers at his job level, were created several months before Plaintiff requested FMLA leave, so they cannot be evidence of pretext. (Instrument No. 10-1 at 107). Although the 2009 forced rankings were not the only criteria used in determining who to include in the RIF, the undisputed evidence shows that the forced rankings

were "were the systematic process by which we identified the people that we thought we could best do without in a turndown." (Instrument No. 18-4 at 142). Because the 2009 forced rankings were created before Plaintiff requested FMLA leave and were the primary tool Defendant and Kovski used in determining who to include in the RIF, the forced ranking cannot provide evidence of pretext.

Plaintiff's third pretext argument is that Lawellin could have been included in the RIF instead of Plaintiff. (Instrument No. 18 at 17). A plaintiff can raise a fact issue on the question of pretext in a RIF case by adducing evidence that "he was *clearly* better qualified than . . . employees who were retained." *Rosenblatt v. 7-Eleven, Inc.*, CIV.A. 3:06-CV-0957D, 2007 WL 2187252 at *7 (N.D. Tex. July 27, 2007) (citing *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992) (emphasis in original)). However, the retained employee must assume some of the plaintiff's duties. *Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 276 (N.D. Tex. 2011) *aff'd sub nom. Powell v. Dallas Morning News, LP*, 486 F. App'x 469 (5th Cir. 2012). Plaintiff does not claim that Lawellin assumed some of his duties upon his termination.

Furthermore, the retained employee the plaintiff wishes to compare himself to must be similarly situated to the plaintiff. *See Utley v. MCI, Inc.*, CIV.A.3:05-CV-0046-K, 2008 WL 836419 *4 (N.D. Tex. Mar. 24, 2008) *aff'd*, 320 F. App'x 250 (5th Cir. 2009) (finding that the retained employee must be similarly situated to the plaintiff in an age discrimination RIF case); *Rosenblatt*, 2007 WL 2187252 at *7 (refusing to allow the plaintiff to compare his qualifications to employees in different departments). The Fifth Circuit has examined the "similarly situated" requirement frequently. "Employees with different supervisors, who work for different divisions of a company or . . . who have different work responsibilities . . . are not similarly situated." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009). Here, Plaintiff admits that

Lawellin and Plaintiff did not have similar work responsibilities because Lawellin was a lower level engineer capable only of performing support-level work. (Instrument No. 18 at 9-10). Therefore, Plaintiff and Lawellin are not similarly situated, so any comparative information regarding Lawellin's qualifications cannot establish pretext.

Finally, Plaintiff claims that he should not have been selected for inclusion in the RIF because he was qualified for his position. (Instrument No. 18 at 9). The Fifth Circuit has made clear, however, that "[i]n the context of a reduction in force, which is itself a legitimate, nondiscriminatory reason for discharge, the fact that an employee is qualified for his job is less relevant-some employees may have to be let go despite competent performance." *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). Here, because URS acknowledges that Plaintiff was qualified for his position and performed competently, Plaintiff must instead show that he was terminated in favor of similarly situated, less qualified individuals who did not take FMLA leave. *See id.* (applying law to age discrimination case). Plaintiff does not cite any evidence of this, and therefore he cannot demonstrate pretext by arguing that he was qualified or that he had a "broad base of skills." (Instrument No. 18 at 9).

Accordingly, Defendant's motion for summary judgment on the issue of FMLA retaliation is **GRANTED**.

## C.

Plaintiff also claims that his termination constitutes unlawful interference with an ERISA benefit because had he continued employment with Defendant for another seven months, he would have been entitled to participate in Defendant's Retiree Health Plan. To sustain a claim of ERISA interference, Plaintiff must show: "(1) prohibited (adverse) employer action (2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled."

*Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250 (5th Cir. 2003). Furthermore, "[t]o prove a violation of ERISA, Plaintiff must establish a prima facie case that Defendant[] fired him with a specific discriminatory intent to violate the Act." *White v. Omega Protein Corp.*, 390 F. Supp. 2d 604, 610 (S.D. Tex. 2005) aff'd, 226 F. App'x 360 (5th Cir. 2007) (citing *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 979-80 (5th Cir. 1993). Specific intent must be proven with positive evidence; speculation and conclusory allegations will not suffice. *White*, 390 F. Supp. 2d at 610 (citing *Stafford v. True Temper Sports*, 123 F.3d 291, 295-96 (5th Cir. 1997)).

Plaintiff's only argument that Defendant terminated his employment with a specific discriminatory intent to interfere with his ERISA benefits is that he contacted the human resources department to confirm he would be eligible for the retiree health plan at his tenth anniversary. (Instrument No. 18 at 20). First, this is not "positive evidence" of specific intent and is instead mere speculation of a connection, which is insufficient as a matter of law. *See White*, 390 F. Supp. 2d at 610. Second, if this were sufficient evidence of specific intent, there is no evidence that the human resources department played any role in Plaintiff's termination, and Plaintiff acknowledges the law is clear that discriminatory animus can only be imputed to a decision-maker. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 683 (5th Cir. 2001). Therefore, his call to the human resources department is irrelevant and there can be no evidence of specific intent.

Additionally, Plaintiff argues that Defendant was seeking to cut costs when he was terminated, showing pretext. (Instrument No. 18-2 at 7). Even if Plaintiff could show specific intent, which the Court finds he cannot do, this claim does not demonstrate pretext because the undisputed evidence shows that individuals enrolled in the retiree health plan are charged the total premium for the coverage elected, and Defendant does not pay any portion of the premium.

(Instrument No. 10-1 at 109). Plaintiff's termination before his ERISA benefits vested saved Defendant no money and Plaintiff has introduced no evidence suggesting this could have been a motive for Plaintiff's termination.

Accordingly, Defendant's motion for summary judgment on the issue of interference with an ERISA benefit is **GRANTED**.

## V.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant URS Corporation's motion for summary judgment is **GRANTED**. **(Instrument No. 10)**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 26th day of June, 2013, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**